# United States Court of Appeals
## For the First Circuit

Nos. 16-2116, 17-2121

UNITED STATES OF AMERICA,

Appellee,

v.

FRANCISCO MARTÍNEZ-MERCADO,

Defendant-Appellant.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Francisco A. Besosa, U.S. District Judge]

Before

Howard, Chief Judge,
Thompson and Kayatta, Circuit Judges.

Victor J. Gonzalez-Bothwell, with whom Eric Alexander Vos, Federal Public Defender, District of Puerto Rico, Vivianne M. Marrero, Assistant Federal Public Defender, Supervisor, Appeals Section, and Andrew S. McCutcheon, Assistant Federal Public Defender, were on brief, for appellant.
Julia M. Meconiates, Assistant United States Attorney, with whom Rosa Emilia Rodríguez-Vélez, United States Attorney, and Mariana E. Bauzá-Almonte, Assistant United States Attorney, Chief, Appellate Division, were on brief, for appellee.

March 25, 2019

**KAYATTA**, **Circuit Judge**.  A jury found Francisco Martínez-Mercado guilty of conspiracy to deprive a person of civil rights in violation of 18 U.S.C. § 241.  The district court then sentenced him to eighty-seven months in prison.  On appeal, Martínez-Mercado challenges the sufficiency of the evidence against him, the admission of evidence under Federal Rule of Evidence 404(b), the exclusion of certain testimony, the denial of his new-trial motion based on newly discovered evidence, and the appropriateness of his sentence.  For the following reasons, we affirm.

## I.

Although we review the facts relevant to Martínez-Mercado's sufficiency challenge in the light most favorable to the government, we also "provide a more or less neutral summary" of the facts relevant to his remaining claims and reserve further exposition of those facts for our later analysis.  See United States v. Flores-Rivera, 787 F.3d 1, 9 (1st Cir. 2015).

The events underlying Martínez-Mercado's conviction took place in September of 2010.  At that time, Martínez-Mercado was working as a Task Force Officer ("TFO") for the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF").  He had previously worked in the Drugs Division of the Puerto Rico Police Department ("PRPD"), where Jorge Fernández had been his supervisor.  The alleged conspiracy included PRPD officers Pedro López-Torres and

Luis Ramos-Figueroa, both of whom eventually cut a deal and testified on behalf of the government.

At trial, López-Torres testified that on September 15, 2010, Fernández told López-Torres that Martínez-Mercado was "going to do a job in the area[] of Carolina" and "need[ed] help in doing that job." Fernández and López-Torres had worked illegal "jobs" together in the past, and López-Torres was conveniently serving in the Property Division of the Carolina Criminal Investigations Unit at the time. Based on Fernández's assurances that Martínez-Mercado was trustworthy, López-Torres eventually agreed to take a call from Martínez-Mercado. Martínez-Mercado called López-Torres almost immediately, and they arranged to meet in person to discuss the job.

That same day, López-Torres contacted Ramos-Figueroa, "[b]ecause he was the person that [López-Torres] trusted to do . . . illegal jobs." The two met up to talk about the potential job in Carolina. Ramos-Figueroa agreed to participate in whatever scheme might unfold.

Days later, López-Torres and Martínez-Mercado met at a gas station to go over the details of the plan. According to López-Torres, Martínez-Mercado said he had hired "some thugs, meaning street criminals," to break into an apartment to steal "money, jewelry and controlled substances, drugs." Martínez-Mercado explained that the apartment belonged to someone who had

recently been arrested by ATF. López-Torres agreed to provide "security" and "communication" using his police patrol car and radio. López-Torres testified that he used his patrol car on jobs so "that people would believe that a legal activity was being conducted there by the police." Additionally, if he heard a complaint come in over the radio, he would warn his co-conspirators and attempt to divert any potential investigation.

On September 23, Martínez-Mercado called López-Torres to tell him that they would execute the plan that evening. López-Torres relayed the information to Ramos-Figueroa. While López-Torres was on duty, he met up with Martínez-Mercado at around 7:00 p.m. in the parking lot of a local supermarket. Ramos-Figueroa joined them shortly thereafter. Martínez-Mercado was driving a mini-van, and both López-Torres and Ramos-Figueroa testified that they could see the silhouettes of at least two other people in the back of the van.

Following a signal from Martínez-Mercado, López-Torres and Ramos-Figueroa drove out of the parking lot in López-Torres's patrol car and trailed the van to the PlayaMar condominium complex. López-Torres parked at the end of the street, while the van remained in front of the building. They watched as two or three people jumped out of the van and entered the complex. López-Torres and Ramos-Figueroa kept their eyes on the van and listened

to the police radio. After they saw the van's interior lights turn on, they left the area.

When López-Torres and Martínez-Mercado reconvened as planned, Martínez-Mercado handed López-Torres about $3,000 to split with Ramos-Figueroa. Martínez-Mercado explained that "there wasn't that much" in the apartment, just "about $6,000 to $7,000 and some jewelry."

López-Torres spoke with Martínez-Mercado over the phone several times over the next week. During one of those conversations, López-Torres informed Martínez-Mercado that a complaint had been filed the day after the break-in. The morning of September 24, another officer, Josue Cosme-Rosa, took photographs of the "ransacked" PlayaMar apartment and concluded that the balcony door had likely been forced open.

The district court allowed the government to introduce so-called "bad acts" evidence under Federal Rule of Evidence 404(b), over objection, through the testimony of two other former PRPD officers, Rafael Ramos-Veléz and Miguel Pagán. The government also presented telephone records and historical cell-site data. This evidence confirmed that Martínez-Mercado, Fernández, and López-Torres had been in contact by phone on September 15 and showed nineteen calls between Martínez-Mercado and López-Torres on the night of the Carolina job. The cell-site

data also showed that Martínez-Mercado's and López-Torres's cell phones were in the area of the PlayaMar that night.

Near the end of the case against him, Martínez-Mercado alleged that the government delayed the production of an FBI report, which detailed an interview with another PRPD officer, Yaritza Cruz-Sánchez, who had investigated the PlayaMar complaint. The district court determined that, although the report was not disclosed until the day before trial, it was not exculpatory or impeaching under Brady v. Maryland, 373 U.S. 83 (1963). The court did not permit the introduction of the report and also denied Martínez-Mercado's request to issue a material-witness warrant for Cruz-Sánchez.

Martínez-Mercado takes issue with two further district court actions during the presentation of his case. First, the district court excluded the testimony of ATF Agents Jean Carlos Rivera and Julio Torres about an ATF investigation that Martínez-Mercado contends would have accounted for his communications with Fernández and López-Torres. After hearing the agents' testimony outside the presence of the jury, the court concluded that they did not have any relevant information. Second, although the district court allowed Fernández to testify, the court advised him of his Fifth Amendment rights three times, and Fernández invoked his right against self-incrimination in response to questioning on cross-examination.

On February 26, 2016, after a five-day trial, the jury found Martínez-Mercado guilty of conspiring to violate civil rights. The district court denied his renewed motion for acquittal under Federal Rule of Criminal Procedure 29 and subsequently denied each of his new-trial motions pursuant to Federal Rule of Criminal Procedure 33.

**II.**

**A.**

Martínez-Mercado appeals the denial of his motions for judgment of acquittal based on the insufficiency of the evidence. See Fed. R. Crim. P. 29(a). We review a district court's denial of a Rule 29 motion de novo, asking "whether, after assaying all the evidence in the light most amiable to the government, and taking all reasonable inferences in its favor, a rational factfinder could find, beyond a reasonable doubt, that the prosecution successfully proved the essential elements of the crime." United States v. George, 841 F.3d 55, 61 (1st Cir. 2016) (quoting United States v. Chiaradio, 684 F.3d 265, 281 (1st Cir. 2012)).

A section 241 conspiracy exists when "two or more persons conspire to injure, oppress, threaten, or intimidate any person . . . in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States." 18 U.S.C. § 241. In this case, the federal right at

issue is the right to be free from unreasonable searches and seizures under the Fourth Amendment. Accordingly, to convict Martínez-Mercado, the government needed to prove beyond a reasonable doubt that he "1) conspired to injure, oppress, threaten, or intimidate [the victim], 2) with the intent to interfere with the victim's [Fourth Amendment] rights, 3) under color of [Commonwealth] law." United States v. Cortés-Cabán, 691 F.3d 1, 13 (1st Cir. 2012) (quoting United States v. Guidry, 456 F.3d 493, 507 (5th Cir. 2006)); see also United States v. Lebron-Gonzalez, 816 F.2d 823, 829 (1st Cir. 1987) ("Although section 241 does not specify a 'color of law' requirement, the Fourteenth Amendment requires it." (citing United States v. Price, 383 U.S. 787, 799 (1966))).

Martínez-Mercado argues that the conspirators did not act under color of law. He also argues that, even if they did act under color of law, there could be no Fourth Amendment violation without more evidence from an identifiable victim. We address these two arguments in turn.

**1.**

Martínez-Mercado's primary argument is that the government failed to prove that he conspired to commit a constitutional violation "under color of law." In truth, Martínez-Mercado's complaint seems to be that the alleged conspiracy was never to orchestrate an illegal seizure under color of law; rather,

- 8 -

the plan was for a band of hired "thugs" -- unmistakably private actors -- to break into the condominium and steal valuables inside. To be sure, Martínez-Mercado does not suggest that the mere involvement of private individuals precludes prosecution under section 241, as any such argument would inevitably prove futile. See Price, 383 U.S. at 794 ("Private persons, jointly engaged with state officials in the prohibited action, are acting 'under color' of law for purposes of [section 241]."); United States v. Aponte-Sobrado, 847 F. Supp. 2d 316, 319-20 (D.P.R. 2012). Nor can he successfully argue that his failure to conceive of the heist in constitutional terms provides any defense. Screws v. United States, 325 U.S. 91, 106 (1945) (making clear that "[t]he fact that the defendants may not have been thinking in constitutional terms is not material where their aim was . . . to deprive a citizen of a right and that right was protected by the Constitution").

Still, the "acts of officers in the ambit of their personal pursuits are plainly excluded" from liability under section 241. Id. at 111. "[P]rivate conduct, outside the line of duty and unaided by any indicia of actual or ostensible state authority, is not conduct occurring under color of state law." Martinez v. Colon, 54 F.3d 980, 986-87 (1st Cir. 1995). Although courts have had frequent occasion to interpret section 1983's "color of law" requirement, "there is no bright line test for

distinguishing 'personal pursuits' from activities taken under color of law." Pitchell v. Callan, 13 F.3d 545, 548 (2d Cir. 1994); see also Price, 383 U.S. at 794 n.7 (noting that, in section 1983 cases, "'under color' of law has consistently been treated as the same thing as the 'state action' required under the Fourteenth Amendment"). We have previously instructed that a state actor does not act under color of law unless his "conduct occurs in the course of performing an actual or apparent duty of his office, or unless the conduct is such that the actor could not have behaved in that way but for the authority of his office." Martinez, 54 F.3d at 986; see also United States v. Classic, 313 U.S. 299, 326 (1941) ("Misuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law, is action taken 'under color of' state law.").

More specifically, this court trains its attention "on the nature and circumstances of the officer's conduct and the relationship of that conduct to the performance of his official duties." Martinez, 54 F.3d at 986. "The key determinant is whether the actor . . . purposes to act in an official capacity or to exercise official responsibilities pursuant to state law." Id.; see also Barreto-Rivera v. Medina-Vargas, 168 F.3d 42, 45 (1st Cir. 1999) ("While certain factors will clearly be relevant -- for example, a police officer's garb, an officer's duty status, the

officer's use of a service revolver, and the location of the incident -- these factors must not be assessed mechanically."); Parrilla-Burgos v. Hernandez-Rivera, 108 F.3d 445, 449 (1st Cir. 1997) (listing the same factors). Martínez-Mercado argues, therefore, that the conspiracy at issue here did not involve conduct committed in the performance of any actual or pretended official duty.

The facts show otherwise. The conspirators literally employed the colors of the law in the form of a marked on-duty police vehicle to do what no private individual could do -- divert private and police interlopers by creating the appearance of legitimate police involvement. The plan also addressed the risk of a citizen call to the police by exploiting López-Torres's official capacity to forestall any investigation at the scene. López-Torres and Ramos-Figueroa were part of the conspiracy and present at the scene of the heist precisely because they possessed the official authority to ensure that it would proceed uninterrupted. This was surely enough to support a jury finding that the conspirators acted under color of law. See United States v. Hatch, 434 F.3d 1, 4 (1st Cir. 2006) (noting that in deciding a sufficiency challenge courts "must only satisfy [themselves] that the guilty verdict finds support in a plausible rendition of the record").

**2.**

Martínez-Mercado also argues that the government failed to prove a Fourth Amendment violation because it did not identify any actual victim who had a "reasonable expectation of privacy" in the PlayaMar condominium. See Katz v. United States, 389 U.S. 347, 360 (1967) (Harlan, J., concurring). Certainly, the government needed to show that the conspirators tried to violate some person's right to be free from an unlawful search and seizure. But the government did this. It presented evidence that the condominium was a home, and a locked one at that. It also put in evidence that Martínez-Mercado knew that the home belonged to a recently arrested person. As the U.S. Supreme Court has explained, "[w]ithout question, the home is accorded the full range of Fourth Amendment protections." Lewis v. United States, 385 U.S. 206, 211 (1966). There is simply no blanket requirement that the victim testify. See Cortés-Cabán, 691 F.3d at 13 (noting that "circumstantial evidence will suffice" to establish the elements of a conspiracy). The government presented sufficient evidence for the jury to reasonably infer that Martínez-Mercado conspired to violate the Fourth Amendment rights of whoever lived in the targeted apartment.

**B.**

Martínez-Mercado next argues that the district court misinterpreted the scope of Federal Rule of Evidence 404 and then

improperly admitted the testimony of two government witnesses under that rule. Although we review the district court's application of Rule 404 for abuse of discretion, when there is an allegation that "the district court misapprehended the scope of the Rules it was applying," we review its legal interpretations de novo. United States v. Gilbert, 229 F.3d 15, 20-21 (1st Cir. 2000); Olsen v. Correiro, 189 F.3d 52, 58 (1st Cir. 1999) ("The proper interpretation of the Federal Rules of Evidence is a question of law and is reviewed de novo.").

Rule 404 dictates that "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). But Rule 404 also specifies that evidence of prior acts may be admissible to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2). We have formulated a two-part test for determining the admissibility of Rule 404(b) evidence. First, a court must determine whether the evidence has some "special relevance" independent of its tendency to show criminal propensity. United States v. Rodriguez-Barrios, 573 F.3d 55, 64 (1st Cir. 2009) (citing United States v. Aguilar-Aranceta, 58 F.3d 796, 798 (1st Cir. 1995)). Second, if the evidence has some such relevance, the court must then decide whether its

probative value is substantially outweighed by the danger of unfair prejudice.  Id.  And probative value "must be considered in light of the remoteness in time of the other act and the degree of resemblance to the crime charged."  United States v. Frankhauser, 80 F.3d 641, 648 (1st Cir. 1996) (quoting United States v. Fields, 871 F.2d 188, 197 (1st Cir. 1989)).

The district court allowed two government witnesses -- PRPD officers Pagán and Ramos-Veléz -- to testify, over repeated defense objections, about two prior uncompleted conspiracies that allegedly involved Martínez-Mercado.  The government summarized that evidence as follows in its pretrial notice of intent to introduce evidence of other bad acts:

> 1.   In or about December of 2010, [while defendant was employed as a TFO for ATF], defendant, along with other Puerto Rico police officers entered a conspiracy to steal money and/or drugs from a house located in Santurce, San Juan, Puerto Rico, under color of law. . . . The plan included staying outside the location while other individuals entered the house dressed as police officers to conduct the robbery.  Their contingency plan included identifying themselves as [PRPD officers] from the Criminal Investigations Division . . . .
>
> 2.   On a date unknown, but while defendant was employed as a TFO for ATF, defendant entered a conspiracy with at least one known Puerto Rico police officer to steal money and/or drugs from a house in Carolina, Puerto Rico, under color of law.

Both plots were ultimately abandoned.  At trial, Pagán testified that the first plot involved the execution of an "illegal warrant" and that he was charged with staying "in front of the house with the police patrol car."  Ramos-Veléz confirmed that the first plot also contemplated the presence of a "marked patrol car."  The only relevant testimony as to the second plot was that Ramos-Veléz and Martínez-Mercado called it off after they noticed that the house in Carolina was armed with security cameras.

The government argued to the district court that its evidence of the two prior conspiracies was admissible "to show that the Defendant had a common scheme or plan" that "involved conducting robberies of homes . . . and that he hired other police officers to . . . assist him in their marked patrol units or, as a contingency plan, should they be detected either by an owner of the apartment or by somebody in the vicinity of the area, to secure the success of the operation."  Accordingly, the district court admitted that evidence as proof of a "common scheme or plan."

But the proffered bad acts did not reveal "a continuing or connected scheme" linking the prior alleged conspiracies to the instant conspiracy.  United States v. Lynn, 856 F.2d 430, 435 (1st Cir. 1988); see also United States v. Varoudakis, 233 F.3d 113, 119 (1st Cir. 2000).  Rather, Pagán's and Ramos-Veléz's testimony showed several such plans, rather than a single common scheme or plan.

The government alternatively argues that the evidence was "specially relevant" to prove Martínez-Mercado's intent. The government, though, does not articulate how Martínez-Mercado's alleged participation in arranging the two uncharged conspiracies is relevant to whether he had the requisite intent to conspire to interfere with a known federal right in this case. See United States v. Guest, 383 U.S. 745, 760 (1966) (noting that the conspiracy charge requires proof of "specific intent"). Although this court has maintained that when bad acts evidence "is introduced to show knowledge, motive, or intent, the Rule 404(b) exceptions . . . have been construed broadly," United States v. Flores Perez, 849 F.2d 1, 4 (1st Cir. 1988), we need be cautioned that "the relevance of a prior conviction admitted to prove 'intent' . . . may rest on little more than propensity," United States v. Henry, 848 F.3d 1, 15 (1st Cir. 2017) (Kayatta, J., concurring). In this case, it is difficult to escape such propensity-based reasoning. As Martínez-Mercado avers, the government's evidence of bad acts broadly highlighted his alleged past corrupt associations with fellow police officers, inviting the jury to generalize this bad behavior into "bad character and [to] tak[e] that as raising the odds that he did the later bad act now charged." Old Chief v. United States, 519 U.S. 172, 180 (1997). This is precisely what the rule seeks to avoid.

The government also arguably suggests that the evidence established Martínez-Mercado's "identity" or "modus operandi" by highlighting the similarity between the prior acts and the September 2010 Carolina job. For Rule 404(b) evidence to be admitted to prove modus operandi, the government must show "a high degree of similarity between the other act and the charged crime." United States v. Trenkler, 61 F.3d 45, 52 (1st Cir. 1995) (citing United States v. Ingraham, 832 F.2d 229, 231–33 (1987)). The government "must demonstrate that the two acts exhibit a commonality of distinguishing features sufficient to earmark them as the handiwork of the same individual." Id. at 53 (citing Ingraham, 832 F.2d at 231). Moreover, under Federal Rule of Evidence 104(b), district courts must condition the admission of modus operandi evidence "on a showing that the shared characteristics of the other act and the charged offense are sufficiently idiosyncratic that a reasonable jury could find it more likely than not that the same person performed them both." Id. In resolving whether the evidence supports an inference that the incidents are "sufficiently idiosyncratic," the inquiry "must focus on the 'totality of the comparison,' demanding not a 'facsimile or exact replica' but rather the 'conjunction of several identifying characteristics or the presence of some highly distinctive quality.'" Id. at 54 (quoting Ingraham, 832 F.2d at 232–33).

The government points to the use of a marked patrol car parked outside the location of the planned heist as such a "highly distinctive quality."  Of course, that identifying feature was said to be present in only one of the two prior conspiracies.  As to that conspiracy, the testimony did indeed describe a plan to park a patrol vehicle outside the location to be robbed.  But the plan as described otherwise markedly differed from the heist that gave rise to this prosecution, most notably because it involved the use of "an illegal warrant."  Nor was there any participation of private individuals or even a break-in.  As Pagán explained: "We were just going to appear there and knock that door down, go inside the house and arrest the woman, take . . . whatever she had there."  Given the differences, it is as if the government were pointing to the use of a ball in both a cricket match and a baseball game as proof of modus operandi for a particular player.  There is a common factor but not one that is so unusual and distinctive as to make two otherwise quite different methods of operation appear to be the mark of a single person.  See Ingraham, 832 F.2d at 233; see also United States v. Pisari, 636 F.2d 855, 859 (1st Cir. 1981) ("The single fact that in committing a robbery, one invokes the threat of using a knife falls far short of a sufficient signature or trademark upon which to posit an inference of identity.").  We cannot say, therefore, that the prior bad acts were "specially

relevant" as evidence of modus operandi.  For these reasons, the admission of the prior bad acts was erroneous.

Nevertheless, we hold that the district court's erroneous admission of the bad acts evidence was harmless.  While we once again underscore "the folly of bad act overkill," United States v. Arias-Montoya, 967 F.2d 708, 714 (1st Cir. 1992), in this case we can determine "with fair assurance . . . that the judgment was not substantially swayed" by the district court's error, Kotteakos v. United States, 328 U.S. 750, 765 (1946); see also United States v. Hicks, 575 F.3d 130, 143 (1st Cir. 2009) ("We review non-constitutional evidentiary errors for harmlessness; an error is harmless if it is 'highly probable that the error did not influence the verdict.'" (quoting United States v. Roberson, 459 F.3d 39, 49 (1st Cir. 2006))).  The cell phone records and location information corroborated the central gist of the cooperators' testimony.  It confirmed the initial contacts between the conspirators, and it solidly placed Martínez-Mercado in the neighborhood of the home invasion in repeated communications with López-Torres without any conceivable innocent explanation. We therefore decline to hold that the admission of the Rule 404(b) evidence was prejudicial error.

## c.

Martínez-Mercado further claims that the district court violated his rights under the Sixth Amendment's Compulsory Process

Clause and the Fourteenth Amendment's Due Process Clause in three ways. First, he argues that the district court undermined his right to present a meaningful and complete defense by excluding the testimony of two ATF agents. Second, he contends that the court erroneously ruled that the government's production of an FBI 302 Report on the eve of trial detailing an interview with Officer Yaritza Cruz-Sánchez was not a Brady violation. The court then compounded that error, Martínez-Mercado claims, by refusing to authorize a material-witness warrant for Officer Cruz-Sánchez and by excluding the 302 Report itself. Lastly, Martínez-Mercado asserts that the court intimidated Jorge Fernández by repeatedly advising him of his Fifth Amendment rights.

## 1.

Martínez-Mercado first complains that the district court excluded the proffered testimony of two ATF agents. In support of his proffer, Martínez-Mercado represented that the agents would testify that Martínez-Mercado was tasked with investigating an ATF cooperating witness in an unrelated matter. That task, he argued, gave him a perfectly legitimate reason to be communicating with Fernández and López-Torres on September 15 because they might have "worked with this confidential informant before." But one of Martínez-Mercado's proffered witnesses indicated that the investigation of the cooperator did not commence until after the cooperator's arrest on September 20. And the other witness offered

no alternative chronology.  In light of that chronological mismatch between the asserted theory or relevance and the actual testimony, the district court sensibly concluded that the testimony was not reasonably capable of establishing the relevant point Martínez-Mercado hoped to establish.  We see no reason to upset that determination.  See Pike v. Guarino, 492 F.3d 61, 78 (1st Cir. 2007) ("Although the right to present a defense is of constitutional dimension, it is not absolute."  (citing Nix v. Whiteside, 475 U.S. 157, 173 (1986))); United States v. Brandon, 17 F.3d 409, 444 (1st Cir. 1994) (noting that the district court has "broad discretion in making relevancy determinations").[1]

**2.**

Martínez-Mercado advances several related arguments concerning the trial court's treatment of a so-called 302 Report summarizing an FBI interview with PRPD officer Cruz-Sánchez. During the interview, Cruz-Sánchez stated that (1) a person other than the owner of the condominium first called in the burglary; and (2) López-Torres told Cruz-Sánchez that "they had taken material (referring to drugs) and money" from the apartment. Martínez-Mercado argues on appeal that the late production of this

---

[1] Martínez-Mercado argues on appeal that even with the September 20 arrest date, he might have started investigating the witness before his arrest.  But he did not make this argument at trial, so plain error review applies, see United States v. Sánchez-Berríos, 424 F.3d 65, 78 (1st Cir. 2005), and there is no clear error because his proffered testimony does not clearly back up this theory.

report (on the eve of trial) was a <u>Brady</u> violation and that the court should have admitted the report into evidence or compelled Officer Cruz-Sánchez to testify.

The district court viewed the report as largely irrelevant and at best marginally impeaching on collateral matters. We see no unreasonableness in that determination. Martínez-Mercado does not attempt to explain how who reported the burglary is even relevant to his defense. He claims only that it "refuted the testimony of Josue Cosme-Rosa," who did testify that "the complainant himself . . . gave [the PRPD] access [to the parking lot]." Cosme-Rosa's testimony, however, had nothing to do with who reported the break-in. It is not clear that the identity of the initial complainant is at all material to Martínez-Mercado's defense.

The district court also aptly explained away any superficial inconsistency between the 302 Report and López-Torres's trial testimony. That is, although López-Torres testified that Martínez-Mercado told him that only money and jewelry were taken from the apartment, López-Torres never testified as to his own knowledge of what was stolen. Besides, the fact that López-Torres told Officer Cruz-Sánchez that drugs were taken from the apartment does not suggest, as Martínez-Mercado claims, that López-Torres "planned or executed the crime." Moreover, as the district court observed, evidence as to how the

robbery was carried out would have been irrelevant to Martínez-Mercado's defense because he was charged with a conspiracy offense that does not require an overt act by him.  See United States v. Crochiere, 129 F.3d 233, 234, 238–39 (1st Cir. 1997) (holding that 18 U.S.C. § 241 does not require an overt act in furtherance of the conspiracy).

Our conclusion that the district court reasonably assessed the proffered evidence as at best marginally and collaterally relevant dooms Martínez-Mercado's trio of arguments. We review the denial of a new-trial motion on the basis of an alleged Brady violation for manifest abuse of discretion.  United States v. Morales-Rodriguez, 467 F.3d 1, 14 (1st Cir. 2006).  And there is no Brady violation compelling a new trial when the belatedly supplied evidence is merely cumulative or impeaching on a collateral issue.  Conley v. United States, 415 F.3d 183, 189 (1st Cir. 2005).  Similarly, we review for abuse of discretion a decision to exclude evidence as cumulative or insufficiently relevant.  Brandon, 17 F.3d at 444.  And there is no such abuse when the evidence is at once both cumulative and relevant only arguably to contradict other evidence on peripheral issues.  Id.[2]

---

[2] From our conclusion that these evidentiary rulings were not an abuse of discretion, it follows that the district court's exclusion of Sánchez-Cruz's testimony and the 302 Report was not constitutional error.

**3.**

Martínez-Mercado's witness-intimidation claim also fails.[3] The district court properly advised Fernández of his Fifth Amendment rights. See United States v. Santiago-Becerril, 130 F.3d 11, 26 (1st Cir. 1997) ("A judge is entitled to make sure a witness understands [his] Fifth Amendment rights."). The district court rightly noted that it did not "actively encourage[] a witness not to testify or badger[] a witness into remaining silent." United States v. Arthur, 949 F.2d 211, 216 (6th Cir. 1991). Martínez-Mercado takes particular issue with the fact that, although the court first read the witness his rights outside the presence of the jury, the judge subsequently "informed Fernández of his ability to invoke his 'rights' on no less than three occasions." It is obvious from the trial transcript, however, that the witness became confused and needed clarification of the judge's proper warning. The court had little choice but to instruct him further. What's more, as the district court found, Fernández "testified fully" for Martínez-Mercado on direct and only invoked his right to remain silent during parts of the government's cross-examination. United States v. Martínez-Mercado, No. CR 15-576 (FAB), 2016 WL 8674489, at *11 (D.P.R. June 17, 2016). The district court did not inhibit Martínez-

---

[3] In his post-trial motions, Martínez-Mercado framed this issue as a judicial-bias claim.

Mercado's right to present a meaningful defense.

**D.**

Martínez-Mercado next argues that the district court abused its discretion by denying his second new-trial motion based on newly discovered evidence. See Fed. R. Crim. P. 33. We review the denial of a new-trial motion for "manifest abuse of discretion." United States v. Carpenter, 781 F.3d 599, 608 (1st Cir. 2015) (citing United States v. Wright, 625 F.2d 1017, 1019 (1st Cir. 1980)). A court may grant a motion for a new trial based on newly discovered evidence if

> (1) the evidence was unknown or unavailable to the defendant at the time of trial; (2) failure to learn of it was not because of lack of due diligence; (3) the evidence is material, and not merely cumulative or impeaching; and (4) it will probably result in acquittal upon retrial.

Carpenter, 781 F.3d at 621 (citing Wright, 625 F.2d at 1019); see also United States v. Hernández-Rodríguez, 443 F.3d 138, 143 (1st Cir. 2006) ("[W]e have no discretion to grant a motion for a new trial if any one of the four factors is lacking."). Since both sides agree that the first two prongs of the so-called Wright test are satisfied, we address only the latter two.

On December 16, 2016, the government disclosed two additional FBI 302 Reports summarizing information provided by Metropolitan Detention Center inmates Arnaldo López-Ortiz and Osvaldo Vasquez-Ruiz. Martínez-Mercado argues in his brief that

these reports, as well as a subsequent telephone interview with Nadab Arroyo-Rosa (another federal inmate), suggest that López-Torres and Ramos-Figueroa "(1) coordinated fraudulent testimony designed to secure the conviction of Mr. Martínez-Mercado; (2) testified falsely and fraudulently at [trial]; and (3) deliberately misled prosecutors during debriefings."  The district court concluded that Martínez-Mercado failed to establish that the newly discovered evidence was material as required by the third prong.  United States v. Martínez-Mercado, 261 F. Supp. 3d 293, 306 (D.P.R. 2017).

New evidence is "material" when "it has the potential 'to alter the outcome of the lawsuit under applicable legal tenets.'"  United States v. Hernández-Rodríguez, 443 F.3d 138, 145 (1st Cir. 2006) (quoting Roche v. John Hancock Mut. Life Ins. Co., 81 F.3d 249, 253 (1st Cir. 1996)).  Newly discovered evidence that is merely impeaching, however, "normally cannot form the basis for a new trial."  United States v. Colón-Muñoz, 318 F.3d 348, 361 (1st Cir. 2003) (quoting United States v. Bonadonna, 775 F.2d 949, 957 (8th Cir. 1985)).  Martínez-Mercado counters that "[t]he value of the evidence was not simply to show that López-Torres and Ramos-Figueroa were generally liars and perjured themselves in the past," but that "[i]t demonstrated they were actively fabricating testimony in this case in order to receive a sentence reduction."

The reports summarize the inmates' claim that they overheard the two cooperating conspirators in this case (López-Torres and Ramos-Figueroa) talking about coordinating testimony. According to the inmates, López-Torres and Ramos-Figueroa discussed "getting a story straight" having to do with a firearm and the possibility that cameras might show them to be someplace on some occasion other than where they claimed to be. One inmate allegedly mentioned that if the prosecutors found out that López-Torres and Ramos-Figueroa were concocting a false story, the "other guy" (presumably, thought the FBI agents, the person against whom López-Torres and Ramos-Figueroa were going to testify) would walk. The government was unable to provide any further information about the context in which these broad statements were made or when the conversation took place. Martínez-Mercado further argues that one of the inmates "specifically confirmed that López-Torres and Ramos-Figueroa discussed concocting false and fraudulent testimony on one or more occasions."

The materiality of the newly discovered evidence depends on whether a jury would probably presume that López-Torres and Ramos-Figueroa were discussing Martínez-Mercado's case in a manner that suggests perhaps a frame. The district court answered in the negative, and we find no abuse of discretion in that determination. Although, as Martínez-Mercado notes, the district court conceded that "[t]he information in the 302 reports suggest[s] that López-

Torres and Ramos-Figueroa concocted testimony," Martínez-Mercado, 261 F. Supp. 3d at 305, the court never stated that the "concocted testimony" related to this case.  On this point, Martínez-Mercado asserts that, "López-Torres and Ramos-Figueroa did not testify at any other trials or in-court legal proceedings."  But nothing in the reports suggests that the reference to "testimony" was limited to trial testimony in this case, as opposed to statements provided to FBI agents and prosecutors in other cases. Further, the reports describe the conversation as covering a withheld firearm and cameras at various locations, significant details that have nothing at all to do with this case.

        For purposes of this appeal, we can nevertheless assume without deciding that the proffered evidence was "material," and not irrelevant or merely impeaching.  That assumption brings us to the fourth prong:  Would the evidence "probably" have altered the result?  We think not.  As we have already explained, the government's case against Martínez-Mercado was not reasonably vulnerable to an enhanced credibility attack on the cooperating witnesses.  It is undisputed that the break-in occurred and that the cell phone evidence placed Martínez-Mercado both in timely repeated communication with López-Torres and in the area of the crime without any suggestion in the record that either of them had any legitimate reason to be there (much less talking to one another) at that time.  There was no testimony at trial about any

camera or firearm. And, had there been, we see no reasonable likelihood that any such evidence could be viewed as exculpatory. The evidence contained in the 302 reports and corroborated by Arroyo-Rosa's interview was not "sufficiently compelling that it would probably result in an acquittal." United States v. Alicea, 205 F.3d 480, 487 (1st Cir. 2000).

**E.**

Finally, Martínez-Mercado argues that his sentence was procedurally unreasonable. The court below calculated a total offense level of twenty-seven and a criminal history category of I, resulting in a guidelines range of seventy to eighty-seven months, and sentenced Martínez-Mercado to eighty-seven months in federal prison. We review sentencing decisions for abuse of discretion, examining findings of fact for clear error and interpretations of the sentencing guidelines de novo. United States v. Flores-Machicote, 706 F.3d 16, 20 (1st Cir. 2013).

The district court correctly calculated a base offense level of seventeen by referencing U.S.S.G. § 2B2.1 pursuant to U.S.S.G § 2H1.1(a)(1), which instructs the court to apply the offense guideline applicable to any underlying offense. Here, the conduct underlying Martínez-Mercado's conviction for conspiring to violate civil rights was burglary of a residence, so U.S.S.G. § 2B2.1(a)(1) dictated a base level of seventeen.

The district court increased the base level by six levels under U.S.S.G. § 2H1.1(b)(1), which applies when the defendant "was a public official at the time of the offense" or "the offense was committed under color of law."  For the reasons we have already explained, there was no error in finding the terms of that enhancement satisfied.

Under U.S.S.G. § 3B1.1(a), the district court increased the base level by an additional four levels because "the defendant was an organizer or leader of a criminal activity that involved five or more participants."  The government presented evidence at trial demonstrating that the alleged conspiracy involved Martínez-Mercado, Fernández, López-Torres, Ramos-Figueroa, and at least two "thugs."  And, contrary to Martínez-Mercado's assertions on appeal, the amended presentence report reflected as much.  The district court did not abuse its discretion at sentencing.

**III.**

Finding the evidence sufficient to sustain Martínez-Mercado's conviction, and finding no other reversible error, we affirm the conviction and sentence.